IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF UNITS #544/515 and #546/513, KEENE SELF STORAGE, LLC, 12 BRADCO ST. KEENE, NH, CURRENTLY LEASED TO BRIAN ROY | Case No. 21-mj-143-01-AJ<br><br>**Filed Under Seal** |

**AFFIDAVIT IN SUPPORT OF**
**AN APPLICATION FOR A SEARCH WARRANT**

I, Special Agent Benjamin Slocum, being first duly sworn, hereby depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1. I am a Special Agent with the U.S. Department of Homeland Security, Immigration and Customs Enforcement (ICE), Homeland Security Investigations (HSI), and have been so employed since June 2007. I am currently assigned to the Manchester, New Hampshire field office. As part of my regular duties as a Special Agent, I investigate criminal violations relating to a broad range of immigration and customs-related statutes and have been cross-designated to investigate violations relating to the distribution of illicit narcotics as specified under Title 21 of the U.S. Code. I have been trained in drug investigations, search warrants, undercover techniques, surveillance, debriefing of informants, and other investigative procedures. Through my training, education, and experience, I have become familiar generally with the manner in which drug distribution organizations conduct their illegal activities, including purchasing, manufacturing, storing, and distributing narcotics, the laundering of illegal proceeds, and the efforts of persons involved in such activity to avoid detection by law enforcement. In the course of participating in investigations of drug distribution organizations, I have conducted or participated in surveillance, the purchase of illegal drugs, the execution of

search warrants, the use of tracking devices, debriefings of subjects, witnesses, and informants, and reviews of consensually recorded conversations and meetings.

2.      I make this affidavit in support of an application for a search warrant under Federal Rule of Criminal Procedure 41 to authorize the search of the following storage unit(s) located at Keene Self Storage, LLC at 12 Bradco Street, Keene, New Hampshire 03431; units #544/515 and #546/513, that are currently rented to Brian ROY of                    , Walpole, New Hampshire (the "Subject Location"), as more particularly described in "Attachment A" hereto, and for authority to seize evidence, fruits, and instrumentalities, of the following offenses:  (a) distribution of and possession with intent to distribute controlled substances, in violation of Title 21, United States Code, Section 841(a)(1); and (b) conspiracy to possess with intent to distribute and distribution of controlled substances, in violation of Title 21, United States Code, Section 846, as more particularly described in "Attachment B".

3.      Based on my training and experience in previous and ongoing drug-trafficking investigations, I have learned of many common characteristics among individuals distributing controlled substances and attempts at concealing the nature of the proceeds from those distributions.  I know that traffickers and distributors of controlled substances often keep at least portions of their controlled substances and proceeds near themselves and in the location where they are residing.  This allows distributors to keep portions of their products readily available for sale while providing security for the substances and proceeds.  However, many traffickers and distributors use storage facilities outside of their residences to hide portions of their controlled substances.  The off-site storage distances the distributor from the full scope of his or her possessed materials and may limit the risk of theft by customers.

4.      Since this affidavit is being submitted for the limited purpose of establishing that probable cause exists to support the issuance of a search warrant, I have not included details

about every aspect of the investigation. While this affidavit contains all the material information I am aware of that is pertinent to the requested search warrant, it does not set forth all of my knowledge about this matter.

## PROBABLE CAUSE

5.      The Keene Police Department (KPD) has historically received information regarding ROY's alleged involvement in narcotic-related activity.  This information includes, but is not limited to, the following: On or about November 2019, a Source of Information (SOI) reported ROY was selling "meth" in the Keene area out of the back of his black truck and had thousands of dollars hidden in his truck from narcotics sales.  At this time, it was known to the KPD that ROY was operating a black GMC pickup truck.

6.      In January of 2020, a local resident reported suspected narcotics sales being conducted by ROY at              .  During this time, two vehicles registered to ROY were seen frequenting the apartment complex.  One resident reported seeing ROY affix, what they described as a metal box, to the undercarriage of his vehicle.  Based on my training and experience, I know magnetic hides are used underneath vehicles to conceal narcotics and/or US currency.

7.      During the month of April 2021, KPD Detective Andrew Lippincott came into contact with a cooperating individual, herein referred to as a CI, who stated they could purchase heroin and methamphetamine from ROY. The CI stated that ROY is involved in the distribution of narcotics in violation of 21 USC § 841 in the greater Keene, New Hampshire area.  The CI originally began cooperating with the KPD for consideration on pending criminal charges.

8.      During the month of April 2021, at the direction of KPD, the CI contacted ROY at       6379 and arranged to purchase heroin and methamphetamine.  The CI stated they could purchase one (1) finger of heroin for four hundred dollars ($400), and I know a finger to be

3

common vernacular for approximately 10 grams of heroin. The CI also stated they could purchase one (1) ball of methamphetamine for three hundred dollars ($300), and I know a ball to be a reference to the product's weight, typically weighing 3 to 3.5 grams.

9. On April 20, 2021, prior to meeting with the CI to complete a controlled drug purchase, KPD detectives observed ROY and his 2017 Dodge Ram vehicle parked in front of the Subject Location. Law enforcement had previously received information that ROY is known to frequent the Subject Location.

10. Prior to the controlled drug buy, Detective Truman and Detective Lippincott met with the CI in a predetermined location, and the CI was provided an amount of documented US currency. Prior to the meet, the CI was searched for unauthorized items and none were located. Surveillance was maintained of the CI throughout the controlled buy by plain-clothes detectives.

11. ROY was observed by plain-clothes detectives leaving the Subject Location in his Dodge Ram vehicle and then traveling to the area of the predetermined buy location. The CI was observed meeting with ROY in the predetermined location. ROY was observed by plain-clothes detectives outside of his Dodge Ram during the controlled buy.

12. Following the controlled buy, the CI met with Detective Truman and Detective Lippincott and confirmed exchanging the documented US currency with ROY for narcotics. The CI turned over two small, clear, plastic bags. The contents of one bag was a pressed "finger" of what Detective Lippincott recognized as heroin, and the CI stated it was sold to them as heroin. The second bag contained a semi-transparent, crystallized substance, which Detective Lippincott recognized to be consistent with a ball of methamphetamine, and the CI stated it was sold to them as methamphetamine. The CI was searched following the buy and nothing noteworthy was discovered.

13. Both substances have been sent to a drug laboratory for testing and results are pending.

14. After the controlled buy with ROY, KPD detectives went to Keene Self Storage and learned ROY had two (2) storage units rented in his name, storage units #544/515 and unit #546/513. These were the storage units ROY was parked in front of prior to the aforementioned controlled buy. According to the storge unit paperwork, ROY had rented unit #544/515 since August 30, 2019, and storage unit # 546/513 since October 2, 2019 at the Subject Location.

15. On April 27, 2021, at the direction of KPD, the CI contacted ROY and arranged to purchase two (2) fingers of heroin/fentanyl and two (2) balls of methamphetamine for the agreed upon price of fourteen hundred dollars ($1,400). The buy was arranged to occur at a predetermined location in Keene.

16. Prior to the controlled drug buy, Detective Truman and Detective Lippincott met with the CI in a predetermined location, and the CI was provided $1,400 of US currency. Prior to the meet, the CI was searched for unauthorized items and non were located. Surveillance was maintained of the CI throughout the controlled buy by plain-clothes detectives, and the CI was observed meeting with ROY in the predetermined location. ROY met with the CI only briefly before leaving the area. During this time, ROY was operating his 2017 Dodge Ram.

17. Following the controlled buy, the CI met with Detective Truman and Detective Lippincott in a predetermined location. The CI turned over what they stated was two (2) fingers of heroin and two (2) balls of methamphetamine. The CI confirmed purchasing the narcotics from ROY for the agreed upon price of fourteen hundred dollars ($1,400). The CI was searched following the buy and nothing noteworthy was discovered.

18. Detective Lippincott observed the narcotics purchased by the CI and they were contained in two separate, small, sealable, glassine bags. Based on Detective Lippincott's

training and experience, he recognized the contents of one bag to be consistent with heroin/fentanyl, as it was pressed into two small "finger" sizes and wrapped in wax paper. Detective Lippincott recognized the contents of the second bag to be two balls of methamphetamine, as it contained various sized, semi-transparent, crystallized substances within the bag.

19. Both substances have been sent to a drug laboratory for testing and results are pending.

20. On May 7, 2021, at the direction of KPD, the CI contacted Roy and arranged a third controlled buy. The CI arranged to purchase three (3) fingers of heroin/fentanyl and three (3) balls of methamphetamine for the agreed upon price of two-thousand dollars ($2,000) from ROY.

21. The buy occurred at a predetermined location in Keene. Prior to the controlled drug buy, Detective LaMears and Detective Lippincott met with the CI in a predetermined location, and the CI was provided two-thousand dollars ($2,000) in US currency. Prior to the meet, the CI was searched for unauthorized items and non were located. Surveillance of the CI was maintained throughout the controlled buy by plain-clothes detectives.

22. The CI was observed meeting with ROY in the predetermined location. ROY was operating his Dodge Ram and met with the CI only briefly before leaving the area. Following the controlled buy, the CI met with Detective Lundin and Detective Lippincott in a predetermined location. The CI turned over what they stated was three (3) fingers of heroin and three (3) balls of methamphetamine. The CI confirmed purchasing the narcotics from ROY for the agreed upon price of two-thousand dollars ($2,000). The CI was searched following the buy and nothing noteworthy was discovered.

23.     Detective Lippincott observed the narcotics purchased by the CI and they were contained in three separate, small, sealable, glassine bags. Based on his training and experience, Detective Lippincott recognized the contents of two bags to be consistent with heroin/fentanyl, as the two bags contained three small, "fingers" wrapped in wax paper. Detective Lippincott recognized the contents of the remaining bag, the third bag, to be three balls of methamphetamine, as it contained various sized, semi-transparent, crystallized substances within the bag.

24.     Both substances have been sent to a drug laboratory for testing and results are pending.

25.     During the month of May 2021, Detective Lippincott observed a known narcotic user, Amelia Cormier, in the driver's seat of ROY's 2007 GMC Yukon and parked in front of the Subject Location. ROY was seated in the front passenger seat. Cormier exited the storage unit parking lot a short time later and was observed by plain-clothes detectives to be meeting up with another vehicle in the parking lot at nearby Hamshaw Lumber (NH registration 308 1738, a 2014 Mazda3, blue in color). The two vehicles stayed parked next to each other for an extended period of time before parting ways.

26.     In the KPD database, the most recent interaction with said vehicle included a welfare check at The Factory gas station, where Maxine Parmenter was reported to be "nodding off" in the vehicle. Based on the training and experience of Detective Lippincott, he knows "the nod," or "nodding off," to be a reference to one's head uncontrollably dropping down as a result of opioid use.

27.     Parmenter is known to the KPD from prior drug investigations, and as an ex-girlfriend of ROY. On April 16, 2021, Parmenter was arrested in Winchendon, MA with an amount of suspected heroin and methamphetamine, and subsequently charged with Possession of

a Class A Controlled Substance (Heroin) and Possession of a Class B Substance (methamphetamine) with Intent to Distribute.

28.     On May 13, 2021, ROY was seen in and around his truck parked at the Key Road car wash.  A short time late, ROY was joined by Cormier driving ROY's Yukon.  During this time, another vehicle parked near ROY, registered to Dustin Re of 179 Wyman Road, Keene, New Hampshire.  The vehicle did not use the car wash, the operator met with ROY briefly, and then left the area.  Based on the training and experience of Detective Lippincott, he recognized this as a common behavior with a narcotics transaction.

29.     The address associated with Re's vehicle registration (179 Wyman) is a known drug house in Keene and the KPD continues to receive anonymous tips regarding suspected drug dealing occurring in and around the address.

30.     ROY then went to the Service Credit Union and picked up a male passenger carrying a backpack. ROY and the passenger then went to the Subject Location, where ROY remained for some time.  While at the Subject Location, ROY was joined by Cormier in the Yukon and Lance Curavoo (DOB           in a 2007 Subaru.  This was the same vehicle parked at the Subject Location prior to the first controlled buy on April 20, 2021.

31.     Lance Curavoo is known to the KPD from prior investigations, including a bank robbery in 2017 where he was driven to the area of the robbery by the owner of the aforementioned drug house.  Additionally, in April 2021, Curavoo's girlfriend stated she believed Curavoo was selling narcotics in the Keene area.

32.     ROY was seen at the Subject Location in his Dodge Ram truck later the same night meeting with at least one additional unknown vehicle.

33.     On May 17, 2021, ROY was observed in the Hannaford's parking lot operating his Dodge Ram truck and parked next to Justin Robinson (DOB           .  The two spoke with

8

their windows down for a short period of time, and Robinson soon left the area. Based on the training and experience of Detective Lippincott, he recognized this to be consistent behavior with a narcotics transaction.

34. Robinson is known to the KPD from previous contacts, including but not limited to being seen coming and going from a known drug house under surveillance. Robinson was a witness to a 2019 fatal drug overdose on Pearl Street. In 2020, during a motor vehicle stop, a known drug user/seller in the greater Keene area was arrested as a passenger from the vehicle Robinson was operating. In August 2020, Trooper Bernier of the NHSP was dispatched to Webb Depot Road in Marlborough for a suspicious vehicle. Upon arrival, he encountered Robinson operating another vehicle registered to ROY, a 1998 Ford Mustang (NH         ) and meeting car to car with ROY. ROY was accompanied by Maxine Parmenter at this time.

35. On May 17, 2021, Roy was observed by plain-clothes detectives operating his Dodge Ram truck. Through gathered intelligence, ROY's truck was known to have traveled to several locations in Manchester, NH before returning directly to the Subject Location. ROY's vehicle remained at the Subject Location for approximately 3.5 hours.

36. The CI reported ROY has traveled outside of Keene to purchase narcotics to bring back to Keene and sell them for profit. The CI reported ROY has traveled to Manchester, NH, to obtain methamphetamine, and picked up at least one ounce on said trip. The CI also stated ROY has traveled to Massachusetts to obtain at least ten (10) fingers of heroin.

37. During a debriefing of the CI, the CI stated that they have previously purchased narcotics from ROY at his storage unit, which the CI described as the storage units near Hamshaw Lumber. Through his employment with the KPD, Detective Lippincott knows this to be an accurate description of the Subject Location. Hamshaw Lumber is located at 3 Bradco Street, and the Subject Location is located at 12 Bradco Street in Keene.

38. Since the onset of this investigation in April 2021, ROY has been seen at the Subject Location on a regular basis. ROY will commonly visit the Subject Location multiple times a day and sometimes visit the Subject Location during the overnight hours. ROY has been known to leave his vehicles at the Subject Location. ROY's visit durations vary, sometimes only staying for a short period of time, and other times ROY will stay at the Subject Location for hours at a time. The frequency, duration, and timing of ROY's visits to his storage units are atypical as compared with most lessors of storage units. I am aware that self-storage units are most commonly used to store surplus home furnishings and personal belongings that the owner does not need frequent access to.

39. Additionally, ROY will commonly meet with other people at the Subject Location. On only one occasion has ROY been seen moving belongings from a unit, and that was when he appeared to be assisting Curavoo moving carpentry tools from a unit rented in Curavoo's name.

40. On May 12, 2021, a federal warrant was issued authorizing the installation of a tracking device on the Subject Vehicle. On May 25, 2021, while servicing the battery on the tracking device pursuant to the warrant, Det. Lippincot observed inside the vehicle mounted to the dashboard what appears to be a "dash cam" recording device. A "dash cam" is a camera that is mounted to the dashboard of a vehicle and is designed to capture and save video—and depending on the make and model of the device, sometimes audio—recordings of events visible through the vehicle's front windshield. Some dash cams have internal storage, meaning that recordings are saved directly to the device and must be retrieved from the device by plugging the device into a compatible computer or tablet and transferring/saving the data to the computer. Other dash cams use an SD or microSD card for storage, meaning that recordings are saved to a removable memory card that is inserted into the device. The memory card may then be removed

from the device and inserted into a compatible computer, and the saved recordings can then be transferred to the computer.

### BIOMETRIC ACCESS TO DEVICES

41. This warrant seeks authorization for law enforcement to compel ROY to unlock any DEVICES requiring biometric access subject to seizure pursuant to this warrant. Grounds for this request follow.

42. I know from my training and experience, as well as from information found in publicly available materials published by device manufacturers, that many electronic devices, particularly newer mobile devices and laptops, offer their users the ability to unlock the device through biometric features in lieu of a numeric or alphanumeric passcode or password. These biometric features include fingerprint scanners, facial recognition features and iris recognition features. Some devices offer a combination of these biometric features, and the user of such devices can select which features they would like to utilize.

43. If a device is equipped with a fingerprint scanner, a user may enable the ability to unlock the device through his or her fingerprints. For example, Apple offers a feature called "Touch ID," which allows a user to register up to five fingerprints that can unlock a device. Once a fingerprint is registered, a user can unlock the device by pressing the relevant finger to the device's Touch ID sensor, which is found in the round button (often referred to as the "home" button) located at the bottom center of the front of the device. The fingerprint sensors found on devices produced by other manufacturers have different names but operate similarly to Touch ID.

44. If a device is equipped with a facial-recognition feature, a user may enable the ability to unlock the device through his or her face. For example, this feature is available on

11

certain Android devices and is called "Trusted Face." During the Trusted Face registration process, the user holds the device in front of his or her face. The device's front- facing camera then analyzes and records data based on the user's facial characteristics. The device can then be unlocked if the front-facing camera detects a face with characteristics that match those of the registered face. Facial recognition features found on devices produced by other manufacturers have different names but operate similarly to Trusted Face.

45.     If a device is equipped with an iris-recognition feature, a user may enable the ability to unlock the device with his or her irises. For example, on certain Microsoft devices, this feature is called "Windows Hello." During the Windows Hello registration, a user registers his or her irises by holding the device in front of his or her face. The device then directs an infrared light toward the user's face and activates an infrared-sensitive camera to record data based on patterns within the user's irises. The device can then be unlocked if the infrared-sensitive camera detects the registered irises. Iris-recognition features found on devices produced by other manufacturers have different names but operate similarly to Windows Hello.

46.     In my training and experience, users of electronic devices often enable the aforementioned biometric features because they are considered to be a more convenient way to unlock a device than by entering a numeric or alphanumeric passcode or password. Moreover, in some instances, biometric features are considered to be a more secure way to protect a device's contents.

47.     As discussed in this Affidavit, I have reason to believe that one or more digital devices will be found during the search. The passcode or password that would unlock the DEVICES subject to search under this warrant currently is not known to law enforcement. Thus, law enforcement personnel may not otherwise be able to access the data contained within the

DEVICES, making the use of biometric features necessary to the execution of the search authorized by this warrant.

48. I also know from my training and experience, as well as from information found in publicly available materials including those published by device manufacturers, that biometric features will not unlock a device in some circumstances even if such features are enabled. This can occur when a device has been restarted, inactive, or has not been unlocked for a certain period of time. For example, Apple devices cannot be unlocked using Touch ID when: (1) more than 48 hours has elapsed since the device was last unlocked; or, (2) when the device has not been unlocked using a fingerprint for 8 hours and the passcode or password has not been entered in the last 6 days. Similarly, certain Android devices cannot be unlocked with Trusted Face if the device has remained inactive for four hours. Biometric features from other brands carry similar restrictions. Thus, in the event law enforcement personnel encounter a locked device equipped with biometric features, the opportunity to unlock the device through a biometric feature may exist for only a short time.

49. In light of the foregoing, and with respect to any device found in SUBJECT PREMISES; law enforcement personnel seek authorization, during execution of this search warrant, to: (1) press or swipe the fingers (including thumbs) of ROY to the fingerprint scanner of the seized device(s); (2) hold the seized device(s) in front of the face of ROY and activate the facial recognition feature; and/or (3) hold the seized device(s) in front of the face of ROY and activate the iris recognition feature, for the purpose of attempting to unlock the device(s) in order to search the contents as authorized by this warrant.

50. The proposed warrant does not authorize law enforcement to compel that an individual present at the SUBJECT PRESMISES state or otherwise provide the password or any

other means that may be used to unlock or access the DEVICES. Moreover, the proposed warrant does not authorize law enforcement to compel an individual present at the SUBJECT PRESMISES to identify the specific biometric characteristics (including the unique finger(s) or other physical features) that may be used to unlock or access the DEVICES.

51.  Based on these facts described above, there is probable cause to believe the Subject Location described above will contain the items described in Attachments B that constitute fruits, evidence or instrumentalities of drug trafficking in violation of Title 21, United States Code, Sections 841(a)(1) (possession with intent to distribute and distribution of controlled substances) and 846 (conspiracy to possess with intent to distribute and distribution of controlled substances). Accordingly, I respectfully request that this Court issue warrants authorizing the search of the Subject Location for the items described in Attachments B.

/s/ Benjamin Slocum
Special Agent Benjamin Slocum
Homeland Security Investigations

The affiant appeared before me by telephonic conference on this date pursuant to Fed. R. Crim. P. 4.1 and affirmed under oath the content of this affidavit and application.

Date: June 2, 2021

Time: 3:56 PM, June 2, 2021

Andrea K. Johnstone
U.S. Magistrate Judge

# ATTACHMENT A

(Description of Property to be Searched)

Keene Self Storage, LLC at 12 Bradco Street, Keene, New Hampshire 03431; units #544/515 and #546/513. The Doors of the storge unit are red with a locking mechanism on the right side of the door about halfway down. The numbers of the units are placed in the upper middle of the unit on the white trim.



Keene Self Storage, LLC Units #546/513



Keene Self Storage, LLC Units #544/515

## ATTACHMENT B

*Items to be Seized*

1. Any and all evidence and/or instrumentalities of violations of Title 21, United States Code, Sections 846 and 841(a)(1), conspiracy to distribute and distribution of controlled substances, including the following:

   a. Methamphetamine or Fentanyl and other controlled substances, substances suspected to be controlled substances, drug processing and packaging materials, cutting agents, and drug paraphernalia and literature;

   b. Any and all documents, records, and items of personal property relating to the purchase, possession or distribution of controlled substances, including the following: telephones and cellular telephones, smart phones, pagers, computers, ledgers, account books, receipts, log books, address books, telephone directories, notes, maps, correspondence (including in digital form), customer lists and records, suppliers' lists and records, delivery forms and records, mailing receipts, car and mailbox rental records, storage facility rental records, telephone answer pads, records relating to domestic and foreign travel such as tickets, passports visas, travel schedules, or correspondence;

   c. From within any cellular phone or other portable electronic device potentially used to communicate with other drug traffickers or customers: 1) Any and all text messages available in the phone via the phone's provided text messaging service, Facebook Messenger messages, and messages available in phone applications such as TextNow, WhatsApp, Signal or additional phone applications specifically designed for communication; 2) Any and all incoming and outgoing calls, for any and all call logs, incoming and outgoing calls, call durations, voicemails, and call history; 3) Any and all stored contacts in the phone and phone numbers

available but not stored; 4) Any and all saved media content within the phones, including pictures, videos, sent picture or videos;

      d.      Any and all physical storage devices, including forced entry into said physical devices, located in the areas to be searched, including but not limited to: safes, lockboxes, magnetic lockboxes, backpacks, locked backpacks, overnight bags, suitcases, handbags, purses, and locked bags;

      e.      Indicia of occupancy/use of the place to be searched: including articles of personal property, such as personal identification, personal correspondence, delivery pouches and backpacks, diaries, checkbooks, notes, photographs, keys, utility bills, receipts, personal telephone and address books, tending to establish the identity of the person or persons in control of the areas to be searched;

      f.      Any and all documents, records and articles of personal property evidencing the obtaining, secreting, transfer, expenditure, and concealment of money and assets derived from or to be used in the purchase, and distribution of controlled substances, including the following: U.S. currency, foreign currency, jewelry, bank books, bank statements, receipts, electronics, financial and negotiable instruments, checks, and money orders, records of wire transfers, tax records; and

      g.      Any and all documents, records, and articles of personal property showing passwords necessary to access the data contained within the cellular telephones, smart phones, and other electronic items being seized; and showing the identity of persons using, possessing, owning, frequenting, or controlling the Subject Vehicle, including: registration, insurance, inspection, keys, owner or rental agreements and records, telephone bills and receipts, photographs, and storage records.

2.	DEVICE UNLOCK: During the execution of the search of the PREMISES described in Attachment A, and with respect to any device located at the SUBJECT PREMISES, law enforcement personnel are authorized to (1) press or swipe the fingers (including thumbs) of ROY to the fingerprint scanner of the seized device(s); (2) hold the seized device(s) in front of the face of ROY and activate the facial recognition feature; and/or (3) hold the seized device(s) in front of the face of ROY and activate the iris recognition feature, for the purpose of attempting to unlock the device(s) in order to search the contents as authorized by this warrant.